Ms. Figueroa? Yes. There we go. Good morning, Your Honor. Good afternoon, yes.  Will the clerk please call the next case? 123-1800-WC, Erica Figueroa, Appellant v. Illinois Workers' Compensation Comm'n, et al., Tootsie Roll Industries, Appalee, by Brian Raderman. Ms. Figueroa, you may proceed. Good morning, Your Honor. Your Honor, I'm not a lawyer, and I couldn't afford a lawyer and time, and I thank you, Your Honor, for allowing me to be here and before the court, before you. Your Honor, I've been suffering an undisputed work injury on July 21, 2018, and I wish to stand on my brief, and I'm here because I need the right shoulder surgery that I need, and I'm entitled to by law. And so I need you to help me to get Tootsie Roll to pay for the surgery that, under the statute of 820-ILCS-3058, for them to pay for it so that I can get my life back because my life's been on hold. And so here it is. So my person is entitled to workman's compensation benefits until my person is relieved of the work injury symptoms until my person is maximally medically improved. And I haven't got that, and I haven't healed from the injury that I sustained on July 21, 2018, Your Honor. And on October 10, 2018, I was scheduled for surgery on the right shoulder, rotator cuff, debridement, bicep tendonosis, and a clavicle resection. And Tootsie Roll stopped my benefits, violating my rights to medical treatment under the law of 820-ILCS-30587-3. An employer may only deny payments or refusal if services are in excess or unnecessary, and I needed the rotator cuff surgery. So I filed a grievance with the union, with Tootsie Roll, and they had to force Tootsie Roll to approve the surgery that I needed, Your Honor. And on November 20, 2018, I had the operation for rotator cuff bursitis, debridement, bicep tendonosis. And I had therapy with a licensed doctor practitioner under the Illinois Department of Federal Professional Regulations. Physical therapy is under the scope of work of chiropractic doctors. For so many weeks, I was there, and I never healed, Your Honor. And I was still in pain, and then, as I am now, and having weakness and dysfunction, passive range of motion, Dr. Goldberg sent me to work conditioning for four weeks. And after two weeks, I was sent back to Dr. Goldberg because of weakness and chronic pain. Physical therapist Grant Arthur requested Dr. Goldberg to get another MRI of my right shoulder because he didn't think that I was healed yet. On June 18, 2019, Dr. Goldberg found my right shoulder clicking with movement of my right arm, indicating that there was nerve impingement. And Dr. Goldberg then noticed that I did not reach maximum medical improvement because my right shoulder was swollen, decreased strength, and chronic right shoulder pain with decreased range of motion, Your Honor. On July 24, 2019, Dr. Goldberg's findings from the MRI was fluid in my bursa, tendonitis, extreme inflammation, and possible cysts, and noted that due to the MRI being of poor imagery, that it's all he can see, Your Honor. On that date, I asked for a second opinion, and Dr. Goldberg agreed that a better quality MRI could reveal more clearly what the prognosis is to find a solution to my dysfunction and the pain that I'm experiencing, Your Honor. We found Dr. Robert Thorsness, a shoulder builder specialist, and he ordered a high-quality closed MRI, and his findings were a right partial thickness rotator cuff tear. He found that I have impingement, tendonitis, subacromial bursitis, severe acromial, acroclavicular joint atrophy, and, Your Honor, I seen Dr. Balaram at that time of my visit, and he was a hand doctor from Tootsie Roll. Tootsie Roll sent me to him, and he was a hand doctor and was not a shoulder doctor. On page 4824 of the deposition from June 30, 2020, Dr. Balaram confirms that he does not have any publications in the shoulder but the hand, wrist, elbow, fingertips, and spine. And under the statute law 735 ILCS 5, part 25, are the expert witness standards, whether or not the witness can demonstrate a sufficient familiarity with the standard of care of practice in the state. An expert witness shall provide evidence of active practice teaching and engaging in university-based research or any combination thereof because of the fact that Dr. Balaram at the time of my visit, along with others, Your Honor, was a hand surgeon and did not specialize or attend school and does not have any publications in the shoulders. With respect, I'm asking the court to void and null the opinion of Dr. Balaram, along with the fact that Dr. AJ Balaram conceded in court during his deposition and stating that if the shot gave Erica Figueroa close to 99% relief, Your Honor, it would warrant a revision in shoulder surgery. At that time, Your Honor, he said when Figueroa asked him if it would warrant me a revision in surgery, he said no. But when my former attorney asked him, he said yes. And so, Your Honor, therefore, there is a remedy available and my substantial right has been affected. My right to remedy to permanently relieve me from the pain and dysfunction of my right shoulder that I'm suffering from to the effects of the work injury that I sustained, Your Honor, on July 21st, 2018. Your Honor, Dr. Figueroa offered me an unfair settlement, asking me that if I agree with the settlement, that I must write a letter of resignation. Your Honor, I did not want to resign at that time because I like my job. I love my job, actually, and everybody there, we consider each other family. And I needed the surgery so that the $50,000 or whatever they were offering me is not enough to fix my arm and I could work. I'm not a lazy person, Your Honor. I sit around able people, able men. Before I got injured, I had a business and everything that I was establishing by God's grace. I'm an evangelist. I do the work for the kingdom. And so, Your Honor, I need your help just because I'm a liability. I haven't been able to work. Nobody wants to hire me, Your Honor, in this condition. I can't write. I have 47 chapters of a book that titles that are waiting to be done. My life is in a halt. And I've been to doctors in Indiana. I have public aid insurance. And they don't want to pay for this injury because it's a work injury. And they're saying Tootsie Roll has to pay. When I asked for assistance, I have two children, Your Honor. And I went to the public aid to get food stamps. When they run my social security, it says I'm unemployed. So, when I asked Tootsie Roll for a letter stating that I'm not employed, that I'm laid off or whatever, because they said I was laid off, then they said that they were going to terminate me if I didn't come back because I still needed help with this shoulder. And so, it's like they're not giving me no help. They're not giving me no work. And I need to work to provide for my children. And right now, it's embarrassing to say this, but I'm homeless, and I'm living with a guy that I don't want to be with. And I just need to be respected and treated fairly. So, Judge, through investigation that was completed, my Administrator-in-Law Judge, Honorable Thomas Tyrell, under the Rule 702, Rule 803, Rule 101, the scope, Rule 102, for purpose and construction, Rule 401, relevant evidence, and 103A and 103B, proof has been made by the laws and statute and authorities, by the medical history reports, by the medical evidence that exists, and the thorough investigation that under Statute 820 ILCS 30111 and Canon 3B, Decision of Commissioner, based on evidence of fact made by findings of the investigation, must be entered into record of proceedings. There is a remedy available, and I'm asking the Court of Justice that demands that he wrote to approve and pay for the prospective medical care that under the Act 820 ILCS 3108-4, along with the physical therapy that I need so that I can become relieved of the work injury symptoms that I'm suffering from. Commissioner Thomas Tyrell, Jay, phoned Your Honor during his investigation that I'm entitled to the workman's compensation, that I need the prospective medical care, ongoing payments from June 2019 until now. It's just Tootsie Roll's been, they've been, like, keeping me oppressed. They're keeping me, and now it's not even about workman's comp. It's about themselves, because this could have been solved a long time ago. All they needed to do was approve my surgery, let me heal, but they're, like, they're using their, I don't know what it is. It's like the devil's using them to keep me oppressed. It's weird. It's, like, I don't know, and I have all this evidence, and, like, they hired Dr. Balaram and paid me to go all the way to Arlington Heights, and at the time, I didn't know my rights, Your Honor, and I go all the way over there, see the hand doctor, and, like, at the time, I had an attorney, and he did a great job, and I'm not here to, like, bash anybody or anything like that. I just need to be relieved from this, because there's, all of this evidence was not presented to the arbitrator at the time, Your Honor, and so after, you know, she got, whatever happens to her, I was left to go to trial by myself, so I appeared before all these judges, and now I'm here, and I need, like, I need to be relieved, and they need to be held accountable, and it's not just this, Your Honor. It's not just this with me, but it's probably happening a lot with them, because they have a history of not holding themselves accountable, and if we don't do anything now, right, they're going to keep doing this until someone kills themselves or something bad happens, because there's no, where's justice, right? Like, this justice system is set up to protect the people of the United States, right, and it's like there's got to be very strong, they have to know that they have to be accountable for what they're responsible for. If I'm truly an injured person, Your Honor, and they know this, and all this evidence has been, I've come to them and brought it to them, to their faces, back to Tootsie Roll, asking them if they can hire me, just give me a job, even when their doctor, A.J. Balaram, testified in court and was trying to make my character look like I'm something that I'm not, and even though all of the evidence, Your Honor, has been presented to them, A.J. Balaram still went around it, and he was impugning my integrity, and like, no, here's all the evidence, and every single thing that Ms. Figueroa, the red light on the timer has just come on, so that ends your argument, your first argument. You will have time to reply to Mr. Raderman's response to your argument, okay? Okay, sir. Well, five minutes in reply for that. All right, Your Honor. Thank you. All right, you're welcome. Mr. Raderman, you may respond to Ms. Figueroa's argument, presentation. Thank you, Your Honor, and Ms. Figueroa, thank you very much. Good afternoon, I'm Brian Raderman on behalf of the Appali Tootsie Roll. May it please the court. Your Honors, I certainly understand the emotional side of this case with Ms. Figueroa's presentation, but the two issues that are properly before you pertain to the causal connection of her right shoulder condition, as well as the reasonableness and necessity of certain postoperative care. I think you heard some arguments today, and those were contained within a brief, that are issues outside of this court's jurisdiction and rely on evidence, which I don't believe is before the court's record. I'm going to rest on my brief because I want to focus this conversation towards the substantive issues of causal connection and medical treatment that the commission decided. The majority of the commission found that there was no causal connection for June 5, 2019. They also found that the postoperative chiropractic care at certain DME, which was a game-ready unit, was not reasonable nor necessary to relieve her of the ill effects of her condition. Those decisions found in Tootsie Roll's favor are factual determinations, which of course subjects this court's review to a manifest way to the evidence standard. Of course, each justice here is very familiar with that standard, but I will state only that the commission's decision should not be overturned unless the opposite conclusion is clearly apparent. The standard is whether there's sufficient evidence to support the commission's decision. And it's within the commission's role to weigh evidence, assign credibility, and rectify any conflicts. And even if this court may draw different inferences, the decision should not be upset unless the opposite conclusion is clearly apparent. The causal connection decision in favor of Tootsie Roll reflects the commission's proper function of weighing evidence, assigning credibility, and rectifying conflicts. Especially as to the last point of resulting conflicts, the commission points out essentially that Dr. Thorson's opinions exist on an island. He's alone in his position on interpretation of diagnostic studies and the deed for surgical intervention. It's particularly striking when you consider that the July 23, 2019 MRI, which Dr. Thorson's thought was a poor quality, but none, no other physician stated as such. The interpreting radiologist, Drs. Ballaram and Dr. Goldberg had no problems with the diagnostic quality of that study. And that's important because of what these physicians, Dr. Goldberg, the initial treating surgeon, Dr. Ballaram, which of course is a section 12 physician and the interpreting radiologist found. Ballaram and the radiologist agree that the July, 2019 MRI show appropriate post-surgical changes. They didn't show tears in their opinion and no spurring on the acromion. But I think maybe the most compelling aspect of the 2019 MRI or the July, 2019 MRI rather was Dr. Goldberg's assessment that the findings were essentially unremarkable except for tendinosis, but they were not supportive or did not corroborate the then contemporaneous complaints that Ms. Figueroa was making. That is in agreement with Dr. Ballaram, whose examination in May of 2019 reached a very similar conclusion that the objective evidence was not supportive of the subjective complaints. But as the medical timeline progresses, we continue to see Dr. Goldberg in his conclusions because he ordered an additional MRI, a closed MRI, which he felt would be of greater diagnostic quality and opined it showed what he thought were dorsal-sided rotator cuff tears. But the interpreting radiologist did not see that. Dr. Ballaram, who reviewed the October, 2019 MRI, did not see that. And in essence, it appears that Dr. Thorsnes' opinion lays on a foundation of his belief that the acromioclavicular joint was incompletely resected. But that foundation is weak because it doesn't rely on a complete set of facts, particularly it doesn't appear that Dr. Thorsnes reviewed Dr. Goldberg's initial 2018 operative report. If he had, he would have seen that Dr. Goldberg wrote he achieved complete resection interoperatively, a conclusion he reached by testing the space with a spinal needle to confirm complete resection anteriorly and posteriorly. Now, I know this is a lot of minutiae, but it's important because if the conclusion is that they're spurring on the acromion causing additional tearing, well, the interoperative findings disprove that spurring. And Dr. Ballaram remains consistent with those interoperative findings in his interpretation of diagnostic studies because he says we see a type I acromion here, which means there's complete resection, which means there is no spur, which means the finding of a tear is likely not the credible conclusion to draw here. Help me out, Mr. Raderman. Who was the surgeon who actually performed the surgery? Dr. Benjamin Goldberg, Your Honor. So he was the one that actually did perform the surgery. And when the patient was opened up, so to speak, did the actual measurements, et cetera. Close examination of his report shows that he noted interoperatively complete resection of the distal clavicle. He inserted a spinal needle after removing the implements and confirmed anterior. So we have a person looking at a picture postoperatively and a surgeon operatively observing what the resection was. Absolutely. And I think the interoperative findings, as you probably heard countless times, is the gold standard of identifying what exists inside of any particular portion of a person's body. And so that interoperative identification of complete resection would contradict the opinions of Dr. Thorsness, who found a spur causing. They may contradict, but as a general rule, greater, greater, greater weight is given to the person who's actually there seeing it. Correct. As it should, because it is direct visualization through an orthoscopic video versus, you know, an MRI imaging or whatever the case may be for a diagnostic study. I believe that does deserve greater evidence. And that weight of the evidence is what the commission has done. They've weighed the evidence of the interoperative findings, the interpretations of Dr. Goldberg on postoperative studies, the interpretations of radiologists on postoperative studies, and Dr. Bolloram's interpretation and conclusions to find the credibility of those combined opinions outweighs that of Dr. Thorsness. And finding Dr. Bolloram's ultimate conclusions that there is no causal connection of ongoing disability to the original accident and no need for surgical intervention to be the most credible, the commission has fulfilled its role. And that's a factual decision, which has sufficient support in the record worthy of affirmance. So the rule is for a court of review that we are limited in our scope to reverse those findings of the commission. Right. I think maybe not supreme is the correct word, but significant deference is owed to the commission on factual findings unless the opposite conclusion is clearly apparent. I don't think that exists here because of all the evidence which is supportive of the commission's determination. In simple language, Mr. Rademan, so that we're limited that we cannot substitute our judgment for the commission if that's found. Is that correct? Yes, that's well spoken. And I cannot add anything to that. So I would suggest, Your Honors, that the sufficient evidence shows the commission's decision is supported. We would ask the causal connection decision it reached, concluding Ms. Figueroa was at an MMI, Massive Medical Improvement on June 5, 2019, is affirmed. And if so, then I would ask that the commission's decision be supported. There is a portion of this case which remains accepted and a remand would be appropriate. The secondary issue is the reasonableness and necessity of some postoperative care. I think that is equally straightforward in that both Drs. Bolloran and Dr. Thorsness suggested that postoperative therapy should be performed by a licensed therapist, not in a chiropractic setting, which would support the finding that chiropractic Durgat's treatment after December 5 of 2018 was not reasonable or necessary. And in the same way, the commission found credible and weighed the evidence of a utilization review, which denied a gain-ready unit as not reasonable nor necessary because there's no evidence to suggest it's better than an ice pack in a shoulder. So on this issue, as in the issue of causal connection, we are asking for affirmance. Thank you. Any questions from the court for Mr. Roderman? May I ask, do you contend the commission appropriately refused the chiropractor bills because it violated, what is it, the two-doctor rule, or is it because it was just not reasonable and necessary? Mr. Roderman. I recall from the commission's decision that they said this two-doctor choice-of-treater position of two-rule was not waived at the arbitration level because there was objections made to the evidence. Frankly, Your Honors, that's not an issue that we have challenged either, at least in this setting. I believe the evidence, though, does show that there was an initial treatment with Concentra, a second visit to an immediate care center, which would constitute a choice, and then a second or a third choice, a third provider, a second choice at Midwest Anesthesia. So if you look at those, if that chain would be one and two, meaning chiropractor Durgat would be three and outside the allotted choices, I understand there was a referral from Midwest Anesthesia to Dr. Goldberg, which keeps Dr. Goldberg in that chain. Thank you. Any questions from the court? Excuse me, Ms. Figueroa. There's a procedure here. We're asking if there's questions from the court. You'll have time to reply here. Any other further questions from the court? None? Okay. Now, Ms. Figueroa, you have five minutes in reply. Okay. Your Honor, in response to what Mr. Raterman is referring to in terms of the federal rule of regulations, it says that the Illinois Department of It says that chiropractors who are practitioners, who are licensed doctors, their work is under the scope. So physical therapy is under the scope. If he was licensed, that's not the issue. And as far as Dr. Robert Thorsness, his findings, more than anybody, because he is my doctor. None of my treating doctors, both Dr. Goldberg nor Dr. Robert Thorsness have deemed me maximally medically improved. Both of them, and I have the evidence here, Your Honor, the MRI findings from Dr. Goldberg, and it says mild tendinosis of distal supraspinatus tendency, however, no gross rupture noted. So even though it's not a gross rupture, it's a small tear, but that small tear is limiting my ability to utilize the function of my shoulder the way that it's supposed to. And Dr. Robert Thorsness explains in his deposition, and it's the same one, okay, this is from Dr. Goldberg, and then Dr. Robert Thorsness, his MRI reads on July 23, 2019, mild increased signal by the supraspinatus mild tendinous junction, possibly from sprain. That's the tear that still remains there. So the supraspinatus tendon is there. And in the deposition, he explains more thoroughly, and it says mild increased fluid in the subacromyosubdeltoid bursa. And the bursa, the supraspinatus tendon, the rotator cuff tendon, is going over the bursa. So my bursa is inflamed with fluid, and it decapsulizes. So, like, I can move it, like, two or three times, and I can't move it anymore. So that's the reason why during my – I had an FTE done, and they found that I can only – I have limits to how many – I can only use this arm 0.5 hours, 0.25 hours, and that's me. I heavily medicated myself so I can pass it because I needed to work. They weren't paying me, and I had to take care of my children, Your Honor. So I went through a thing with that. So here, with Dr. Robert Thorsness and his deposition, he did – he gave me an acromyo shot, and in that shot, Your Honor, I thought I was going back to Dr. Robert Thorsness to see – to tell him that God healed me. I thought I was healed from this shot, right, because it miraculously took all my pain away, and I was just mobile, right? And so I was like, okay, I'm done. So it relieved me, and in this – this is how he found his conclusion that I needed the – it's my rotator cuff, and because the evidence proves right here with these MRIs, Your Honor, and this medical evidence proving that there's something going on in this shoulder that needs help. It's hurting, it's in pain, there's dysfunction, I can't write, I squeeze things, I can't open jars. So when the rotator cuff, if you look more extensively, Your Honor, you will see that when a person's rotator cuff is damaged, and the reason why – and in this deposition of Robert Thorsness, Your Honor, he explains how he knows that it's a rotator cuff tear, and all these different things, why my nerves are being impinged, that's the reason why I can't position my arm to write in certain ways, or like if I'm squeezing to write, it affects my neck, it affects everything, because all my nerves from scar tissue, Your Honor, it's being smashed. It's like it needs to be – they need to be freed, and I need surgery to take all of that scar tissue off to free my nerves, and it'll relieve me, but I can't – you know, I understand what Raterman is saying, Mr. Raterman, but it's all here in its existing evidence, and he's the professional, he's the specialist, Your Honor, he knows what he's talking about, and respectfully, with the compensation committee, that they came together and they made their opinions, Your Honor, based off of an opinion that was made, and the opinion was made by A.J. Balaram, who does not specialize in shoulders. He does not work and exercise daily on upper extremities. The only upper extremity, Your Honor – Ms. Figueroa, your time has expired. The red light's on. Thank you, counsel, both, if there's no questions for the questions from the court, which I do not see there are. Thank you, counsel, both, Ms. Figueroa and Mr. Raterman, for your arguments in this matter. We have a complete understanding of the case. We thank you for that, and this case will be taken under advisement, and a written decision will be rendered, which you will receive. And at this time, the clerk of our court will escort you from our remote courtroom. Thank you. Thank you, Your Honor.